[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 11, 2003
THOMAS K. KAHN
CLERK

No. 02-14370

D. C. Docket No. 00-03291-CV-PCH

QUIET TECHNOLOGY DC-8, INC.,
as a general partner of Quiet Technology
Venture Ltd., d.b.a. Joint Venture
of Quiet Nacelle Corporation,
QUIET TECHNOLOGY, INC.,

Plaintiffs-Counter-
Defendants-Appellants,

versus

HUREL-DUBOIS UK LTD.,

Defendant-Counter-
Claimant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(April 11, 2003)**

Before HULL, MARCUS and FARRIS*, Circuit Judges.

---

*Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

MARCUS, Circuit Judge:

Although this case arises in a technologically sophisticated context, the evidentiary issues it presents are straightforward. At its core, this appeal requires us to determine whether the district court abused its discretion by admitting, and subsequently rejecting a post-trial challenge to, the testimony of Joel Frank ("Frank"), an expert in computational fluid dynamics ("CFD") for appellee Hurel Dubois UK, Ltd. ("Hurel"). We also must evaluate the propriety of the district court's refusal to appoint an independent expert to assess the reliability of Frank's proffered testimony and its denial of a motion for a continuance filed by appellant Quiet Technology DC-8, Inc. ("Quiet"). After considering the arguments raised in the parties' briefs and at oral argument, we conclude that despite the scientific complexity of the testimony in question the district court performed its critical gatekeeping function in admirable fashion, perceive no abuse of discretion in any of the rulings challenged on appeal and, accordingly, affirm.

I.

A detailed recitation of the facts and expert opinion testimony offered is essential to understanding this case. Quiet is a corporation that during the mid-1990s was engaged in the development and manufacture of "hush kits" for the

Pratt & Whitney JT3D fanjet engine, which powers the Douglas DC8 aircraft. The purpose of these kits was to reduce the noise generated by the JT3D so as to render the engine compliant with federal "Stage 3" noise reduction regulations. See 14 C.F.R. Part 36. To accomplish their quieting function, appellant's kits employed two "ejectors," which were placed on either side of the rear of the engine and acted as mufflers. Each ejector was essentially an open section of cowling[1] that covered the engine area immediately above and behind the fan exit. These ejectors performed their "hushing" function by diverting the flow of ambient air passing over the cowling, i.e., over the outside of the engine, and mixing that air with the faster-moving exhaust air coming from the engine fan exit. This mixing of airflows had the effect of reducing the noise generated by the engine.

Each side of the JT3D fan jet engine has a fan exit, and accordingly Quiet's hush kit featured an ejector on each side as well. Complicating the placement of these ejectors, however, was the fact that the JT3D also has a thrust reverser that is associated with each fan exit.[2] This is important because the ejector could not be

---

[1]"Cowling" is defined as "a removable metal covering that houses the engine and sometimes a part of the fuselage or nacelle of an airplane." Webster's Third New International Dictionary 526 (3d ed. 1961).

[2]Thrust reversers are inactive while the aircraft is in flight. However, they are vitally important following touchdown, when the plane needs to decelerate quickly. At this point, the thrust reversers activate by either sliding backwards or opening outward, and diverting the airflow forward so as to counter the aircraft's forward momentum.

placed over the fan exits in the absence of some modification to the thrust reversers. Accordingly, during the spring of 1993 Quiet entered into a contract with Hurel pursuant to which Hurel was to design a thrust reverser for the JT3D that would be compatible with Quiet's ejector. Quiet describes the design created by Hurel in these terms:

> [Appellee] replaced the original JT3D reverser with a "pivoting door" design that used the forward section of the ejector as a pivoting thrust reverser. When the engine was placed in reverse, the thrust reverser (i.e., the ejector forward section) pivoted down into the fan flow so as to block and reverse the engine thrust. To pivot the thrust reverser, [Hurel's] design included reverser pivot arms, hinges, brackets, pushrods and a locking device and cavity ("reverser linkages") placed directly behind and within the thrust flow of the engine fan.[3]

Thus, the new thrust reverser consisted of Quiet's ejector plus the reverser linkages designed by Hurel.

Quiet opted against model -- i.e., wind tunnel -- testing of the thrust reverser and instead skipped straight to full scale, in-flight testing of the device. These tests were conducted upon the delivery of prototype reversers to appellant in November, 1996. Unfortunately, these trials revealed that the DC-8 was unable to climb or cruise as quickly as it could in the absence of the new thrust reverser. In

---

[3]To be clear, the reverser linkages rested within the engine's thrust flow not only when the engine was placed in reverse, but during periods of normal, i.e., forward, operation as well.

fact, by Quiet's account, performance losses exceeding 25% were experienced at cruise altitude, although these losses were less pronounced at lower altitudes and slower speeds. Quiet accounts for these losses as follows:

> In forward flight, when the thrust reverser serves as the forward section of the ejector, the reverser linkages partially block the fan flow. As the fan flow reaches supersonic speeds,[4] that partial blockage causes the formation of shock waves, which in turn cause airflow disruption that reduces engine performance.

Hurel, by contrast, attributes the performance degradation not to the reverser linkages, but instead to the design of the hush kit itself, and specifically to drag created by the leading edge of the ejector. In this vein, appellee says that Quiet knew in advance that its hush kit would degrade in-flight performance.

In an effort to rectify this diminution in performance, in 1998 Quiet retained Analytical Methods, Inc. ("AMI") to conduct a CFD study on the hush kit. CFD is a relatively new[5] scientific discipline that uses computer models to measure fluid dynamics, e.g., the flow of air around and through a jet engine. AMI reported that the leading edge of Quiet's ejector was defective, and it designed a new ejector edge, which it called a "droop snoop," to correct what it termed an "oversized thrust reverser inlet and the associated losses due to inlet spillage and

---

[4]Appellant notes that although the aircraft does not reach supersonic speed, the airflow through the engine does exceed the speed of sound during the plane's ascent.

[5]"Relatively new," as used here, means at least 20 years old.

5

compressibility effects (lip shock)." Appellant says that although it replaced the leading ejector edge with the droop snoop, it achieved only a minimal improvement in performance.

Quiet subsequently consulted with Synaps, Inc., which determined that AMI's CFD analysis was flawed because it had not used the correct inflow and boundary conditions.[6] Instead, it found that the performance losses resulted from shock waves caused by the reverser linkages during periods of supersonic airflow through the engine. According to Synaps, these shock waves reduced the thrust generated by the JT3D. Synaps recommended imbedding Hurel's reverser linkages in the walls of the ejector so as to remove them from the flow of air through the engine. However, neither this nor any other modification to appellee's thrust reverser was economically feasible. Moreover, the market for hush kits evaporated on December 31, 1999, the date by which all aircraft were required to be in compliance with the federal noise regulations. As such, Quiet alleges, Hurel's thrust reverser ultimately proved to be worthless.

Based on this pattern of dealing, Quiet brought suit against Hurel on August 16, 2000 in the state Circuit Court for the Eleventh Judicial Circuit, in and for

---

[6]Boundary conditions, which are discussed more fully infra, pertain to the spatial boundaries of the area being studied. For example, a boundary condition might be the front of an aircraft or the point of an engine's air intake.

Miami-Dade County. It asserted claims sounding in fraud, negligent misrepresentation, breach of contract and breach of fiduciary duty. It sought to recover the advance payments it had made to Hurel for the allegedly defective thrust reversers, monies that it had expended in investigating the cause of the performance degradation, $4.5 million that it had spent attempting to improve appellee's original design, lost profits and expenditures resulting from its manufacture of unuseable hush kits and lost profits from unrealized hush kit sales. Shortly thereafter Hurel removed the case to the United States District Court for the Southern District of Florida. Discovery proceeded, and a trial date of December 17, 2001 was set. However, in August, 2001, Hurel filed an unopposed motion to modify the scheduling order. The district court granted appellee's motion, and the trial was rescheduled for March 18, 2002. In December, 2001, the parties filed a joint motion in which they asked the court to extend various discovery deadlines, but not the trial date. On December 28, 2001, the district court granted this motion as well.[7]

On January 23, 2002, Hurel produced a copy of a CFD report that had been prepared by Joel Frank, an expert who it intended to call at trial. Subsequently, on

---

[7]The district court's original pretrial orders required the submission of expert reports by November 2, 2001 and expert depositions to be conducted by December 31, 2001. The court's December 28, 2001 order extended expert the deposition deadline until February 15, 2002.

February 4, 2002, Quiet again moved for a continuance of the trial date. In support of this request Quiet cited (1) its need to study Frank's report; (2) its need to complete its depositions of Frank and other testifying experts; (3) the failure of its own expert (Frank Lynch ("Lynch")) to complete his analysis; (4) its need to study 28,000 pages of engineering data that Hurel had produced on December 27, 2001; and (5) the fact that Quiet's lead counsel was in the middle of moving his offices. After a hearing, however, the district court denied this motion, although it did postpone the trial one additional week until March 25, 2002. On February 26, 2002, Frank replaced his report with a corrected version, and Quiet deposed him on March 5, 2002. Also on February 26, 2002, the district court set a March 15, 2002 deadline for the filing of motions. Although appellee filed a Daubert motion prior to this deadline, appellant failed to do so, opting instead to announce at the pretrial conference (which was conducted five days before trial) that it would be challenging the admissibility of Frank's proffered opinions.

Frank is an aerodynamics specialist who at the time of trial had nearly 20 years experience with CFD, having conducted over 40 studies using the discipline. In September, 2001, he began a CFD study of Quiet's hush kit ejector using Fluent[8] software. Fluent's CFD software had been used extensively in the

---

[8]Fluent is a commercial provider of CFD software and services.

aerospace industry, and had been employed in studying airflow fields in and around ejectors specifically. Frank analyzed two types of "cases," both of which were modeled on Quiet's original design for its hush kit (i.e., prior to the addition of the droop snoop)[9]: "flight profile cases" and "uniform flow profile cases." The former used pressure measurements that had been taken by Quiet during its in-flight testing of Hurel's thrust reverser, and the latter employed a constant uniform pressure at the leading edge of the ejector. This, Hurel says, enabled Frank to ascertain how the ejector would have performed under ideal conditions, i.e., with the air from the engine's fan mixing perfectly with ambient air entering through the front of the ejector. The uniform flow profile cases employed numerous different input pressures so as to replicate a wide range of speeds and conditions.

As Hurel explains, "[a]n initial step in CFD involves 'modeling' the product to be studied, and one of the precursors to modeling is establishing 'boundary conditions.' The boundary conditions define where the model begins and where it ends." In uniform flow profile cases, Frank placed the inlet boundary condition more than a meter ahead of the leading edge of the ejector, while in flight profile cases he placed the inlet boundary condition at "the highlight of the ejector's

_____

[9]This version of the hush kit is referred to by the parties as the "Stage 3" version, after the noise reduction regulations of the same appellation that the reverser was designed to meet. Quiet calls the version of the kit that featured the droop snoop "Stage 3 with aerodynamic improvements."

leading edge." He opined that it was unnecessary to model the entire aircraft because the only issue in the case concerned the losses of thrust stemming from conditions within the engine.

Frank ran 16 cases in total, and concluded that when outfitted with the Stage 3 thrust reverser the JT3D fan jet engine experienced performance losses of approximately 25%. However, he opined that 19.45% (or 78% of the 25% total loss) was attributable to the ejector's leading edge, while only 3.08% (or 12% of the 25% total loss) was attributable to the reverser linkages, with the remaining 10% of the losses caused by other aspects of appellant's hush kit with which Hurel was not involved. Frank also reviewed the studies of the thrust reverser conducted by AMI, and found additional support for his conclusions in the fact that AMI's results were consistent with his.

Although the district court agreed to consider Quiet's challenge to Frank's proposed testimony, the timing of the challenge forced it to conduct a Daubert hearing at the conclusion of the sixth day of trial, which had begun on March 25, 2002. At this hearing, counsel for Quiet repeatedly questioned the boundary conditions that Frank had selected. Appellant also presented evidence of its own, including testimony from Lynch. Following the conclusion of arguments on appellant's motion in limine, the district court invited the parties to submit

10

pertinent publications and other such materials in support of their positions. Although Hurel availed itself of this opportunity, Quiet did not. On the ninth day of trial, the district court announced its decision to admit Frank's testimony, reasoning that the CFD process is generally reliable and had been reliably applied by Frank. Although Quiet urged the district court to appoint an independent expert to assist it in fulfilling its gatekeeping function, and despite the court's candid acknowledgment that such an appointment would have been helpful had appellant not raised its evidentiary challenge so close to trial, the district court declined to make the appointment, saying "it would take a month" for an expert to analyze the data and submit a report to the court.

On April 10, 2002 (the 13th day of trial), the case was submitted to the jury on special interrogatories. The following day the jury passed a note to the district court indicating that it was "hopelessly deadlocked" as to one of the interrogatories. The parties stipulated that they would accept a majority verdict, and shortly thereafter the jury returned a 7-1 verdict in favor of Hurel. Quiet promptly moved for a new trial based on the district court's decision to admit Frank's testimony, but the court denied this motion and entered judgment in favor of Hurel. This appeal ensued.

On appeal, Quiet advances four distinct claims. First, it says that the district court erred by denying its motion in limine to exclude Frank's testimony. In this vein, it argues specifically that (1) Frank was not qualified to render expert opinions as to the cause of the JT3D's performance loss; (2) his methodology was unreliable; and (3) his testimony was irrelevant, i.e., did not assist the trier of fact, as it was based on the Stage 3 version of the ejector, which did not include the droop snoop. Second, it asserts that the court erred by refusing to appoint an independent expert to evaluate the reliability of Frank's methods and results. Third, it contends that the district court erred by denying its motion for a new trial under Daubert. Finally, Quiet argues that the court committed reversible error by denying its February 4, 2002 motion for a continuance.

## II.

Each of the claims advanced by Quiet is properly evaluated under the abuse of discretion standard. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999) ("Our opinion in Joiner makes clear that a court of appeals is to apply an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 515, 139 L. Ed.

12

2d 508 (1997))); Walker v. Am. Home Shield Long Term Disability Plan, 180 F.3d 1065, 1071 (9th Cir. 1999) (holding that decisions regarding "the appointment of an expert . . . are reviewed for abuse of discretion") (citation omitted); Ledford v. Sullivan, 105 F.3d 354, 358 (7th Cir. 1997) ("We review the denial of a . . . motion for appointment of an expert witness for abuse of discretion.") (citation omitted); Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002) ("We review [the] denial of a motion for new trial under the abuse of discretion standard.") (citation omitted); United States v. Bowe, 221 F.3d 1183, 1189 (11th Cir. 2000) ("We review the disposition of requests for trial continuances for abuse of discretion.").

As for Quiet's primary claim in this case, i.e., its challenge to the district court's admission of Frank's testimony, this standard of review requires that we defer to the district court's evidentiary ruling unless that ruling is "'manifestly erroneous.'" Joiner, 522 U.S. at 142, 118 S. Ct. at 517 (quoting Congress & Empire Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L. Ed. 487 (1878)). As the Supreme Court held in Joiner, "our cases on the subject go back as far as [Congress & Empire Spring Co.], where we said that '[c]ases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling

13

is manifestly erroneous.'" Id. (quoting Congress & Empire Spring Co., 99 U.S. at 658); see also Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11ᵗʰ Cir. 1998) ("It is very much a matter of discretion with the trial court whether to permit the introduction of [expert] evidence, and we will not reverse the decision of the trial court regarding the exclusion or admission of such evidence unless the trial court's decision is 'manifestly erroneous.'" (citing Joiner, 522 U.S. at 142, 118 S. Ct. at 517)) .

A.

Fed. R. Evid. 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Supreme Court recognized in Daubert v. Merrell Dow Pharms., Inc., Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of scientific testimony. 509 U.S. 579, 589, 113 S. Ct. 2786, 2795,

125 L. Ed. 2d 469 (1993); see also McCorvey v. Baxter Healthcare Corp., 298

F.3d 1253, 1256 (11th Cir. 2002). This responsibility is identical when the court is

presented with a proffer of expert technical evidence. Kumho Tire, 526 U.S. at

147, 119 S. Ct. at 1174. In either case, we engage in a three part inquiry to

determine the admissibility of expert testimony under Fed. R. Evid. 702.

Specifically, we must consider whether:

> (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)

(citing Daubert, 509 U.S. at 589, 113 S. Ct. at 2794); see also Maiz v. Virani, 253

F.3d 641, 665 (11th Cir. 2001) (same).

Importantly, although there is some overlap among the inquiries into an

expert's qualifications, the reliability of his proffered opinion and the helpfulness

of that opinion, these are distinct concepts that courts and litigants must take care

not to conflate. Thus, for example, while an expert's overwhelming qualifications

may bear on the reliability of his proffered testimony, they are by no means a

guarantor of reliability. By the same token, a reliable opinion expressed by a genuinely qualified expert may not help the jury if it does not pertain to a fact at issue in the case. Thus, as the Court put the matter in <u>Daubert</u>: "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93, 113 S. Ct. at 2796.

In ascertaining the reliability of a particular scientific expert opinion, we consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. <u>McCorvey</u>, 298 F.3d at 1256 (citing <u>Daubert</u>, 509 U.S. at 593-94, 113 S. Ct. at 2796-97). Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a

16

federal court should consider any additional factors that may advance its Rule 702 analysis.  See Kumho Tire, 526 U.S. at 150, 119 S. Ct. at 1175.

In the end, although "[r]ulings on admissibility under Daubert inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology," McCorvey, 298 F.3d at 1256, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Indeed, as we said in Maiz, "[a] district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" 253 F.3d at 666 (quoting Allison v. McGhan 184 F.3d 1300, 1311 (11th Cir. 1999)).  Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596, 113 S. Ct. at 2798; see also Ambrosini v. Labarraque, 101 F.3d 129, 141 (D.C. Cir. 1996) ("The district court[] err[ed] . . . [by] misconce[iving] of the limited 'gatekeeper' role envisioned in Daubert.  By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").  Moreover, "[w]e will not overturn an evidentiary ruling and order a new trial unless the objecting

17

party has shown a substantial prejudicial effect from the ruling." Maiz, 253 F.3d at 667 (citations omitted).

When we apply these principles to the facts of this case, we conclude that the district court did not abuse its discretion in admitting Frank's testimony.

B.

In this case, Quiet first challenges Frank's qualifications to render an expert opinion concerning the cause of the JT3D's performance loss. Although Quiet concedes that "Frank's testimony concerning his background and employment would appear at first blush to establish a certain degree of expertise," it contends that "his true lack of specific expertise was evidenced by his ignorance of basic concepts, his inconsistencies in explaining basic concepts and his confusion respecting specific command if his other testimony was reliable." Among the specific shortcomings in Frank's reports on which appellant focuses in attacking his expert qualifications are (1) his failure to distinguish between engine pressure ratio ("EPR") and fan pressure ratio ("FPR"), having explained numerous mistaken references to FPR instead of EPR in his calculations as mere typos; (2) his analysis of the old leading ejector edge instead of the droop snoop; (3) his use

of incomplete and inappropriate flight test data to "validate" his Fluent results; and (4) his use of improper boundary conditions.

Under Fed. R. Evid. 702, a witness may be qualified as an expert by virtue of his or her "knowledge, skill, experience, training, or education." The problem with Quiet's argument, however, is that none of the shortcomings in Frank's analysis on which it focuses genuinely bear on any of these factors. Instead, Quiet simply has restated its methodology arguments in terms of Frank's qualifications, and in so doing, we think, has ignored the conceptual distinction between an expert's qualifications and the reliability of his proffered opinion. "In essence," as Hurel accurately describes it, "[appellant's] argument is that anyone who would use the methodology that [] Frank used must not be qualified." Indeed, Quiet explicitly says that "all of the facts that demonstrate Frank's lack of expertise are equally strong evidence of the unreliability of his methods." Because it has not advanced any attack that truly calls into question Frank's expert qualifications, Quiet -- which bears the burden of demonstrating that the district court abused its discretion in qualifying Frank, see generally Elcock v. Kmart Corp., 233 F.3d 734, 743 (3d Cir. 2000) -- has failed to carry that burden.

Viewed more abstractly, if methodological unreliability or a lack of intellectual rigor precluded a witness from being qualified as an expert, then this

would largely eviscerate the reliability determination, as one's expert qualification would foreordain the conclusion that the methods employed by that individual were reliable. Yet our caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony. See McCorvey, 298 F.3d at 1256 ("Daubert requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury."); Tompkins v. Moore, 193 F.3d 1327, 1337-38 (11th Cir. 1999) (describing conditions under which an expert's opinion may be considered unreliable). Thus, the fact that the qualification and reliability inquiries are distinct is a compelling conceptual reason to reject appellant's arguments as to Frank's qualification.

Moreover, as a substantive matter -- i.e., even if we were reviewing this question de novo -- it appears plain that the district court's qualification of Frank was proper. At the time of trial, as we have noted, Frank had worked with CFD for nearly 20 years. His experience with CFD dated to his college days, when he worked with experts in the field. Following his completion of B.A. and M.A. programs in aerospace engineering, he worked for several aerospace companies, where he performed over 40 CFD analyses and assisted in roughly 80 additional such studies. In summarizing its findings as to qualification, the district court said: "It seems to me in this case that Mr. Frank is qualified by his experience and

20

by his education, including his on-the-job education. Like all of the experts have had a very impressive background, at least impressive to the Court. So I don't think that's really the issue." We agree; under these circumstances, it is evident that Frank was properly qualified as an expert by virtue of his extensive education, training and experience. See generally United States v. Paul, 175 F.3d 906, 911 (11th Cir. 1998) (holding that the witness in question was properly qualified as an expert in handwriting analysis based on the facts that he: "(1) was a full time handwriting examiner for 30 years; (2) was a member of four professional handwriting analysis organizations; (3) established both the Secret Service's and the Naval Investigative Service's 'questioned document' laboratories; (4) lectured and taught extensively in the field of handwriting analysis; and (5) trained new 'questioned document' examiners for several law enforcement organizations.").

C.

Quiet also challenges the reliability of Frank's testimony. In evaluating whether Frank's testimony was reliable, it is important to be mindful of a distinction that appears throughout the parties' arguments: the difference between the reliability of computational fluid dynamics generally and of Frank's application of CFD in this case. See generally Kumho Tire, 526 U.S. at 153-54,

119 S. Ct. at 1177 ("[T]he specific issue before the court was not the reasonableness in general of a tire expert's use of a visual and tactile inspection to determine whether overdeflection had caused the tire's tread to separate from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.") (emphasis in original). Although Quiet expressly contests the latter, it does not appear to seriously dispute the former.

As for the reliability of CFD generally, the district court found that this discipline had repeatedly been used to assess internal flows and that the results generated from these tests had been critically evaluated in peer-reviewed articles and studies. It further found that CFD entails "a high degree of reliability with a relatively low rate of error." Finally, the court determined that "the application and the use of this kind of software is fairly widespread in the aviation industry. And it's been used and applied in applications which are very analogous to the case we have before us." Quiet raises no argument on appeal that calls any of these conclusions into doubt. In fact, in its reply brief, appellant says that it does "not dispute the propriety of using the Fluent software to solve CFD problems." Indeed, courts and scholarly commentators alike have recognized, both implicitly

22

and explicitly, the uses and benefits of CFD.  See generally Buckley v. Airshield Corp., 116 F. Supp. 2d 658, 661 (D. Md. 2000) (adjudicating issues arising in a patent claim where the relevant technology consisted of "fluid dynamics associated with road-vehicle aerodynamics and computational fluid dynamics"); Flomerics, Ltd. v. Fluid Dynamics Int'l, Inc., 880 F. Supp. 60, 61-63 (D. Mass. 1995) (preliminarily enjoining the production of CFD software that infringed on a copyright owned by the plaintiff CFD firm); Gene J. Heady, Comment, Stuck Inside These Four Walls:  Recognition of Sick Building Syndrome Has Laid the Foundation to Raise Toxic Tort Litigation to New Heights, 26 Tex. Tech L. Rev. 1041, 1060-61 (1995) (mentioning various applications for CFD analysis); Lewis D. Solomon & Suzanne E. Schoch, Developing Critical Technologies:  A Legal and Policy Analysis, 9 Santa Clara Computer & High Tech. L. J. 153, 179-80 (1993) (noting that the 1990 United States Defense Department's Critical Technologies Plan not only listed CFD as one of the 20 most critical technologies to the prospective development of weapons systems, but listed it in the group of "technologies that were the most pervasive and judged to be of top priority").

Instead, Quiet argues that Frank misapplied the generally valid principles underlying CFD.  Specifically, it says that he "put the wrong information into the [Fluent] software.  In other words, 'garbage in, garbage out.'"  Quiet makes

23

several specific arguments in this regard. First, it avers that the reliability of Frank's CFD analysis of the JT3D[10] was undermined by his failure to use the proper equation in calculating intake pressures for his uniform profile cases. In particular, Quiet contests the correctness of Frank's calculation of fan pressure ratio.[11] This is important, appellant argues, because the pressure and other aerodynamic forces that act on the ejector determine the amount of drag created by any given component, including the reverser linkages. Accordingly, if the data used is incorrect, the drag determination necessarily will be flawed as well.

Hurel responds to this contention in two ways. First, it argues that the study is valid even if Frank's formula was incorrect.[12] Second, Hurel points out that this

_____

[10]This criticism is aimed at Frank's second, "corrected" report.

[11]The equation that Frank used in deriving intake pressures for the uniform profile cases was: $PT_{Intake} = FPR(P_{amb})$, where $PT_{Intake}$ is the intake pressure, FPR is the fan pressure ratio and $P_{amb}$ is the ambient pressure. Thus, the intake pressure equaled the fan pressure ratio multiplied by the standard ambient pressure for the particular altitude being tested. For example, for the 35,000 feet altitude calculation, the ambient pressure -- which is a known, unchanging figure -- was 23,842 pascals which, when multiplied by a power setting of 1.9 FPR, yields a $PT_{Intake}$ of 45,300 pascals. To arrive at the FPR, Frank divided the total pressure at the intake (Pt2.5) by the ambient pressure. However, Quiet says that he should have derived the FPR by dividing the total intake pressure (Pt2.5) by the exit pressure (Pt2). Quiet avers that as a result of this error, the $Pt_{Intake}$ derived by Frank was "substantially less than the actual varying intake pressures at the fan exit and substantially greater than the actual varying pressures at the ambient air intake gap. . . . [B]y using the wrong formula and the fictitious uniform flow, Frank did not even come close to duplicating the actual ejector intake pressures. By itself, this fundamental error assured the inaccuracy of Frank's analysis."

[12]In particular, appellee contends that "the correlation of intake pressures to FPRs for the uniform flow cases was insignificant because the study was performed parametrically across a wide range of intake pressures. Therefore, the uniform flow cases showed trends for ejector performance over a range of intake pressures." In other words, Hurel says that even if Frank's conclusion as to

24

formula was used <u>only</u> in the uniform flow cases, and not in the flight profile

cases. Yet the uniform flow cases did not purport to represent reality. Instead,

they represented the ideal condition where the ejector permitted a perfectly

unimpeded mixed air flow. Moreover, as appellee notes, Quiet enjoyed (and

availed itself of) the opportunity to flesh this point out on cross-examination.

Perhaps this latter point is the most important of all. Quiet's argument is

that Frank misused a method that, in the abstract, is reliable. It does not contest

the formulation that $PT_{Intake} = FPR(P_{amb})$. Instead, it says that Frank miscalculated

FPR. Put differently, Quiet does not argue that it is improper to conduct a CFD

study using the sorts of aerodynamic data that Frank employed, but rather that the

specific numbers that Frank used were wrong. Thus, the alleged flaws in Frank's

analysis are of a character that impugn the accuracy of his results, not the general

scientific validity of his methods.

The identification of such flaws in generally reliable scientific evidence is

precisely the role of cross-examination. <u>See generally</u> <u>Daubert</u>, 509 U.S. at 596,

113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary

---

the the $PT_{Intake}$ for a given FPR was incorrect, it was correct for a different FPR. As such, appellee asserts that even assuming the truth of Quiet's argument, Frank's analysis was not completely invalid, but instead required (at the most) a "re-matching" of $PT_{Intake}$ figures with the appropriate FPR.

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Maiz, 253 F.3d at 667. Indeed, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002); see also id. ("Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice."); Cummings v. Standard Register Co., 265 F.3d 56, 65 (1st Cir. 2002) (holding that "whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony); In re TMI Litig., 193 F.3d 613, 692 (3d Cir. 1999) ("'So long as the expert's testimony rests upon "good grounds," it should be tested by the adversary process -- competing expert testimony and active cross-examination -- rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic.] weigh its inadequacies.'" (quoting Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998))); Wilmington v. J.I. Case Co., 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial . . . .

[T]hese matters go to the weight of the expert's testimony rather than to its admissibility.").

Although Quiet designates several additional elements of Frank's study as methodologically flawed, see infra., and argues that his testimony consequently was unreliable, the foregoing analysis applies with equal force to these contentions; appellant's arguments go to the weight, not the admissibility, of the evidence he offered.[13]  Indeed, in summarizing several of its arguments as to reliability, Quiet says that "Frank's failure to include all available flight test

---

[13]In particular, Quiet asserts that Frank failed to consider "the relationship between the pressure in a duct and the aerodynamic forces that act on that pressure."  It specifically takes issue with Frank's testimony that "[i]n a drag study, the drag on a given surface is not dependent on what's happening behind that surface."  Appellant contends that this statement is flawed because if the rear of the duct is entirely blocked, no air will pass through the duct, and thus no drag will be created by any obstruction, like the reverser linkages, in what would otherwise be the flow of air through the duct.  In connection with this argument, Quiet says that the nature of the drag is "greatly complicated where the airflow is supersonic."  It asserts that in flight the flow of air through the JT3D modulates between subsonic and supersonic speeds, that Frank's analysis does not account for this variable, and that the validity of his conclusions regarding the engine's performance loss consequently is undermined.

Appellant also argues that in his uniform flow cases Frank incorrectly sought to introduce a consistent pressure into the very front of the duct, so as to simulate an ideal performance by the ejector.  It says that the flows actually are separated at the front of the duct and cannot merge into a uniform flow until they have passed through the ejector and are mixed.  It further contends that Frank's conclusions are unreliable because he deviated from Fluent's instructions and methodology by setting incorrect boundary conditions and CFD parameters.  It says that the boundary conditions should have been set at discernable distances in front of and behind the ejector.  Frank, however, set both of his boundary conditions inside the ejector at points aft and rear of the reverser linkage.  Finally, Quiet argues that Frank improperly purported to "validate" his analysis with actual flight test data, as he (1) selected from the hundreds of flight tests that had been conducted by appellant only two test runs made in May, 1998; and (2) disregarded significant portions of the data generated by the test flights.

parameters in his model is fatal to any meaningful correlation of flight test results with computer results . . . ." Yet the Supreme Court has explicitly rejected the same argument in a different substantive context, holding that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." Bazemore v. Friday, 478 U.S. 385, 400, 106 S. Ct. 3000, 3009, 92 L. Ed. 2d 315 (1986).

Because Frank's methods and results were discernible and rooted in real science -- i.e., were "intellectual[ly] rigor[ous]," Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176 -- they were empirically testable. As such, they were subject to effective cross examination and, indeed, were questioned vigorously by Quiet. Accordingly, this is not a case where the jury was likely to be swayed by facially authoritative but substantively unsound, unassailable expert evidence.

Under these circumstances, we cannot say that the district court abused its discretion, i.e. committed manifest error, in allowing the presentation of this evidence to the jury. See Daubert, 509 U.S. at 596, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Allison, 184 F.3d at 1311 (same); see also Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 n.3 (3d Cir. 2002) ("While the

28

Federal Rules of Evidence call upon the courts to serve as gatekeepers who independently evaluate the admissibility of expert opinion testimony, they rely upon the discretion of the trial courts -- not the discretion of the courts of appeals. Because the record contains some factual basis -- albeit shaky -- for [the expert's] testimony, the District Court did not abuse its discretion in performing this gatekeeping function.") (citations omitted); <u>United States v. Brannon</u>, 146 F.3d 1194, 1197 (9th Cir. 1998) (relying on the fact that the evidence in question "was subject to challenge on cross-examination" in holding that the district court did not abuse its discretion in admitting it); <u>Cantrell v. GAF Corp.</u>, 999 F.2d 1007, 1014 (6th Cir. 1993) ("[The plaintiff's expert] was subject to cross-examination, and his views were countered by the testimony of defendants' expert. Under these circumstances, we find no error in the admission of [the plaintiff's expert's] testimony.").

### D.

Quiet next challenges the relevance of the testimony given by Frank. As the Supreme Court said in <u>Daubert</u>:

> Rule 702 . . . requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-

29

> helpful. An additional consideration under Rule 702 --
> and another aspect of relevancy -- is whether expert
> testimony proffered in the case is sufficiently tied to the
> facts of the case that it will aid the jury in resolving a
> factual dispute. The consideration has been aptly
> described . . . as one of "fit."

509 U.S. at 591, 113 S. Ct. at 2795-96 (internal punctuation and quotations omitted).

In this case, Quiet bases its relevance argument on the fact that Frank analyzed the Stage 3 version of the ejector, which lacked the droop snoop. It asserts that it "made it clear that its claims against [Hurel] were based on the latest and most refined version of the hush kit. At the time this lawsuit was filed, and at all times thereafter, the ejector with the droop snoop was the latest and most refined version." Essentially, appellant's argument is that Frank analyzed an ejector that was not at issue in the lawsuit, and that his analysis simply was inapposite to the claims at bar. In this vein, Quiet argues that "just as AMI had found, Frank found that the performance loss was substantially caused by the old, superceded leading edge."

Preliminarily, there simply is no question that Frank's testimony is relevant in the first sense mentioned in Daubert, namely, that it is related to an issue in this case. Although Quiet says that its claims were based only on the version of the

30

hush kit that featured the droop snoop, an examination of its complaint reveals that it plainly sought compensatory damages for the expenditures that it made "to determine the cause of the performance degradation experienced in the test flights using defendant's reversers." As the complaint and the briefs both indicate, these tests began in late 1996 and continued through 1998, when Quiet retained AMI to assess the performance loss. In fact, it was only as a result of AMI's analysis that the droop snoop was created. As such, there is no question that Frank's analysis of the effect of the reverser linkages in the Stage 3 hush kit -- as opposed to the version of the kit with the droop snoop -- was relevant to the compensability of the expenditures made by appellant in investigating the performance loss between 1996 and 1998. If the linkages did not cause the diminution in the performance of the JT3D, then contrary to Quiet's claim, Hurel was not liable for the cost of rectifying that performance loss.

In the same vein, Frank's analysis of the Stage 3 ejector also was relevant to the compensability of the cost of developing the droop snoop itself, which the complaint similarly designates as recoverable. If the performance loss was attributable to the reverser linkages, then Hurel might have been liable for the cost of modifying the hush kit; if not, then appellee bore no liability in this regard. Thus, Quiet's statement that "it was clear that [appellant] was seeking damages

31

based on [the] performance of the most improved version of the hush kit" is simply inaccurate.

As for the second aspect of relevance discussed in Daubert, we have characterized this as a requirement that the disputed evidence "have a valid scientific connection to the disputed facts in the case." Allison, 184 F.3d at 1312; see also Daubert, 509 U.S. at 591-92, 113 S. Ct. at 2796 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). In In re Paoli R.R. Yard PCB Litig., the Third Circuit set forth a helpful explication of this concept. The court said:

> [A]nimal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans. . . . Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case. . . . For example, in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves.

35 F.3d 717, 743 (3d Cir. 1994) (emphasis in original).

In this case, the principles employed by Frank in analyzing the performance loss experienced by the JT3D when it was fitted with the Stage 3 hush kit were not only scientific, but were scientific for purposes of this case. There can be no

genuine dispute that Frank's testimony regarding the relationship between the reverser linkages and the performance loss was directly relevant to one of the primary issues in this case, namely, the source of the performance loss experienced by the JT3D when outfitted with the Stage 3 hush kit. Had the only issue in the case been whether the performance loss of the JT3D when outfitted with the droop snoop was attributable to Quiet's ejector (or, conversely, to the reverser linkages), then Frank's analysis of the Stage 3 kit would indeed have been akin to the use of a scientifically valid animal study to analyze humans. However, the effect of the Stage 3 hush kit was an issue in this case; in the terms employed by the Third Circuit, Quiet essentially placed into dispute the effect of chemical X on animals. Notably, although Frank's testimony might not have been relevant insofar as it sought to explain the performance loss experienced by the engine when outfitted with the snoop droop, this does not mean that it could not properly have been admitted by the district court at all. See generally United States v. Zapata, 139 F.3d 1355, 1358 (11th Cir. 1998) (discussing the admission of evidence for a limited purpose); Jones v. Childers, 18 F.3d 899, 913 (11th Cir. 1994) (same). As such, the court's determination of relevance ("fit") cannot properly be labeled an abuse of discretion; that is, it cannot be deemed "manifest error."

33

## III.

Quiet also argues that the district court abused its discretion by failing to appoint an independent expert to help it assess the admissibility of Frank's testimony. We are unpersuaded.

Under Fed. R. Evid. 706(a), a district court may on its own motion or at a party's request appoint an independent expert to aid its analysis of the admissibility of proffered evidence. Such an appointment is especially appropriate where the evidence or testimony at issue is scientifically or technically complex. See Allison, 184 F.3d at 1310-11. Where a party requests the appointment of an expert to aid in evaluating evidence that is relevant to a central issue in the case, the court is obligated to fairly consider the request and to provide a reasoned explanation for its ultimate decision on the matter. Steele v. Shah, 87 F.3d 1266, 1271 (11th Cir. 1996).

However, we are unfamiliar with any set of circumstances under which a district court bears an affirmative obligation to appoint an independent expert. Quite the contrary, as long as the district court thoroughly considers a request for the appointment of such an expert and reasonably explains its ultimate decision

thereon, that decision is vested in the sound discretion of the trial court.[14]  See

Oklahoma Natural Gas Co. v. Mahan & Rowsey, Inc., 786 F.2d 1004, 1007 (10th

Cir. 1986) ("The district court has discretion to appoint an independent expert

witness.  The fact that the parties' experts have a divergence of opinion does not

require the district court to appoint experts to aid in resolving such conflicts.  We

conclude that the district court was in no way obligated to appoint an expert in this

case and its failure to do so cannot give rise to error." (citing Fed. R. Evid.

706(a))) (other citations omitted).  As Professors Wright and Gold have observed:

> Rule 706 fails to prescribe any standard for when a court should
> appoint a[n] expert witness.  The provision also fails to provide a
> standard for selecting an expert witness after a court has decided to
> appoint one.  The first two sentences of subdivision (a), which
> address the questions of appointment and selection, use the word
> "may" no less than four times.  Accordingly, these questions are
> matters within the discretion of the trial court.

29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure §

6304, at 465 (1997); see also id. at 469 ("[E]ven where [various] factors . . . point

in favor of appointing an [independent] expert witness, it is not an abuse of

discretion to refuse to make that appointment.").

---

[14]This is not to say that the denial of a request to appoint an independent expert is immune from appellate scrutiny.  Under this standard, a district court could abuse its discretion in refusing to appoint an independent expert with literally no explanation or if its decision not to appoint such an expert resulted from some discernible extra-legal bias or prejudice or was otherwise without any reasonable basis in fact or law.

Importantly, in this case the reasons underlying the district court's denial of Quiet's request were principled and explicitly articulated, and thus the requirements set forth in <u>Shah</u> were satisfied. <u>See</u> 87 F.3d at 1271. Indeed, despite the district court's grant of two continuances and its repeated extension of the motions deadline, Quiet failed to file any <u>Daubert</u> motion by that deadline. Instead, appellant waited until the eve of trial to inform the district court of its plan to raise a <u>Daubert</u> challenge to Frank's testimony, and the court held a hearing on this issue on the evening of the sixth day of trial. Although the court recognized that an expert could be of substantial assistance in its reliability determination, it concluded that adherence to its already twice-continued trial schedule was of greater importance in this case, given Quiet's lack of diligence in pursuing its challenge.

Indeed, under these circumstances the district court was not obligated to consider appellant's evidentiary challenge at all. <u>See generally</u> <u>American Simmental Ass'n v. Coregis Ins. Co.</u>, 282 F.3d 582, 588 (8th Cir. 2002) (holding that where a party raised an affirmative defense "for the first time in its renewed motion for summary judgment, brought on the eve of trial after the deadline for filing summary judgment motions had passed . . . the district court acted well within its discretion in declining to consider the issue"); <u>Alfred v. Caterpillar, Inc.</u>,

262 F.3d 1083, 1087 (10th Cir. 2001) ("[B]ecause <u>Daubert</u> generally contemplates a 'gatekeeping' function, not a 'gotcha' [f]unction, [our caselaw] permits a district court to reject as untimely <u>Daubert</u> motions raised late in the trial process; only in rare circumstances will such tardy motions . . . be warranted."); <u>United States v. Rinchack</u>, 820 F.2d 1557, 1564 (11th Cir. 1987) ("A trial court is not required to grant an eleventh hour request for [expert services under 18 U.S.C. §] 3006A(e) . . . , particularly where the delay in making the request is unjustified and would require a continuance of the hearing and/or trial.").

Thus, even if a reasoned declination to appoint an independent expert pursuant to Fed. R. Evid. 706(a) could possibly constitute an abuse of discretion, it certainly did not rise to this level in this case.

## IV.

Quiet also argues that just as the district court committed manifest, reversible error in failing to uphold its <u>Daubert</u> challenge to Frank's testimony, the court likewise abused its discretion in denying appellant's motion for a new trial based on the identical <u>Daubert</u> arguments.

This argument fails because Quiet's <u>Daubert</u> challenge is unavailing as a substantive matter, as discussed <u>supra</u>. Importantly, no new grounds for excluding

37

Frank's testimony under <u>Daubert</u> came to light during the trial. In fact, Quiet explicitly conceded as much in its very motion for a new trial, in which it said: "[f]urther argument [regarding the <u>Daubert</u> challenge] . . . would have added little more than unseemly whining. Both the [c]ourt and opposing counsel were fully aware of plaintiff's position." <u>Compare</u> <u>Comer v. Am. Elec. Power</u>, 63 F. Supp. 2d 927, 938-39 (N.D. Ind. 1999) (granting a motion for a new trial on <u>Daubert</u> grounds, saying that "[i]t is unfortunate for all concerned that these fatal deficiencies were not fully appreciated until after trial. Nevertheless, having now had an opportunity to thoroughly review the entire record, we find that [the expert's] . . . trial testimony lacked an adequate factual, technical, or scientific foundation."). In the absence of such new grounds, the district court cannot be said to have erred by denying a motion for a new trial based on its proper admission of this testimony. <u>Micro Chem., Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1389 (Fed. Cir. 2003) ("Because we conclude that the district court properly performed its gatekeeping role, and did not abuse its discretion in allowing Micro Chemical's damages expert to testify, . . . we affirm the district court's . . . denial of the defendants' motion for a new trial."); <u>Pittman v. ANR Freight Sys., Inc.</u>, 47 Fed. Appx. 266, 270 (6th Cir. 2002) ("[T]he district court's decision to admit the testimony of Pittman's experts was not an abuse of discretion, and that court's

38

denial of Defendants' motion for judgment as a matter of law or a new trial on the issue of expert testimony is affirmed.").

V.

Finally, Quiet argues that the district court abused its discretion in denying its February 4, 2002 motion for a continuance. It says that this denial "required [appellant] to go to trial on the merits of this case while simultaneously attempting to mount its hurried Daubert challenge to [] Frank's anticipated testimony. Those two sets of burdensome activities occurred simultaneously in the last frantic days before trial itself, due to delays in [Quiet's] receipt of [] Frank's reports, and delays in making [] Frank available for deposition. The continuance would have permitted [appellant] to make a more cogent case for exclusion of [] Frank's testimony . . . [and] to permit [Quiet] an adequate opportunity to prepare to cross examine [] Frank and to counter his testimony at trial."

In Hashwani v. Barbar, we adopted a four part standard for evaluating claims that a district court abused its discretion by denying a request for a continuance. We held:

> First, we consider the extent of appellant's diligence in his [or her] efforts to ready his [or her] defense prior to the date set for hearing.

39

Second, we consider how likely it is that the need for a continuance could have been met if the continuance had been granted. Third, we consider the extent to which granting the continuance would have inconvenienced the court and the opposing party, including its witnesses. Finally, we consider the extent to which the appellant might have suffered harm as a result of the district court's denial.

822 F.2d 1038, 1040 (11th Cir. 1987) (quoting United States v. 2.61 Acres of Land, 791 F.2d 666, 671 (9th Cir.1985)). In applying this standard, we should be mindful that "[t]he denial of a continuance is within the broad discretion of the district court and will not be overturned unless arbitrary or unreasonable." Id. (citation omitted); see also Munoz v. Orr, 200 F.3d 291, 303 (5th Cir. 2000) ("'[A] trial court's decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent a clear abuse of discretion.'" (quoting Geiserman v. MacDonald, 893 F.2d 787, 790 (5th Cir. 1990))).

In this case, the first factor does not weigh heavily in favor of either party. Although Quiet was diligent in its preparation for trial, there is at least some question as to the efficiency of its preparations. As for the second factor, it appears evident that if the district court had been so inclined it could have postponed the trial until a date sufficiently distant as to allow appellant to conduct its analysis of Frank's second report in a more comfortable timeframe.

Third, it seems that the district court would have been inconvenienced by yet another continuance, as this trial lasted three weeks, thus consuming a great deal of the court's time (and preventing it from hearing most other matters during this time period). As such, it is likely that the court would have been forced to either reschedule several previously scheduled proceedings or postpone the trial until a date far enough in the future that its calendar was not already filled, thus acting in direct contravention of its interest in the expeditious disposition of its pending caseload. See generally Morris v. Slappy, 461 U.S. 1, 11, 103 S. Ct. 1610, 1616, 75 L. Ed. 2d 610 (1983) ("Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons.").

Finally and most importantly, Quiet suffered no harm as a result of the denial of the continuance because its Daubert challenge is unavailing on its merits. See Matthews v. C.E.C. Indus. Corp., 202 F.3d 282 (10th Cir. 1999) (table disposition) (citing cases for the proposition that in the absence of extreme prejudice the denial of a continuance does not constitute an abuse of discretion); Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co., 423 F.2d 842, 844 (5th Cir. 1970) (holding that the denial of a continuance does not rise to the level of an

41

abuse of discretion unless the decision "severely prejudices" the moving party). Thus, the requisite prejudice is lacking.

Also relevant to the question of whether the denial of a motion for a continuance was an abuse of discretion is whether the district court previously granted a continuance. See In re Kellogg, 197 F.3d 1116, 1119 (11th Cir. 1999) ("Given that Kellogg had already received one continuance and especially given Kellogg's noncompliance with the judge's scheduling order and failure to respond to discovery, the judge acted well within his discretion in denying a continuance."); see also generally Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d 829, 859 (11th Cir. 1990) (noting "that the subject motion was defendants' second request for enhanced time to respond to plaintiffs' summary judgment motion"); Stouffer v. Stifel, Nicolaus & Co., Inc., 83 F.3d 431 (10th Cir. 1996) (table disposition) (holding that the district court's denial of a pro se plaintiff's request for an extension of time to respond to a motion to dismiss was not an abuse of discretion where two previous extensions had been granted). Here, the district court previously had continued the trial date and had twice pushed back the discovery schedule. This factor also supports our conclusion that the district court acted reasonably in denying Quiet's February 4, 2002 motion for a continuance.

Under these circumstances, the district court's denial of the continuance sought by Quiet did not constitute an abuse of discretion.

VI.

Because Frank was properly qualified as an expert and the evidence he offered was both reliable and helpful, the district court properly admitted his testimony under Daubert and denied Quiet's motion for a new trial. As such, we cannot possibly conclude that either of these rulings constituted an abuse of discretion. Moreover, given the circumstances under which Quiet requested the appointment of an independent expert and another continuance of the trial date, the district court's denial of both of these requests cannot be considered an abuse of discretion either. Accordingly, we affirm the district court's judgment in all respects.

**AFFIRMED.**