**James John WAITE, Jr. and Sandra Waite, Plaintiffs,**

v.

**AII ACQUISITION CORP., et al., Defendants.**

**Case No. 15-cv-62359-BLOOM/Valle**

United States District Court, S.D. Florida.

Signed July 11, 2016

Christian Hartley, Maune, Raichle, Hartley, French & Mudd, Mt. Pleasant, SC, Dawn Besserman, Maune, Raichle, Hartley, French & Mudd, Edwardsville, IL, Jonathan Ruckdeschel, Z. Stephen Horvat, The Ruckdeschel Law Firm, Ellicott City, MD, Rebecca Shull Vinocur, Rebecca S. Vinocur, P.A., Coral Gables, FL, for Plaintiffs.

Todd Carlton Alley, Hawkins, Parnell, Thackston and Young, LLP, W. Clay Massey, Alston & Bird, LLP, Atlanta, GA, Henry Salas, Andrew Scott Freedman, Clarke Scott Sturge, Cole, Scott, & Kissane P.A., Miami, FL, James J. Ostertag, Paul V. Lankford, Lankford, Crawford, Moreno & Ostertag, LLP, Walnut Creek, CA, Terrence M.R. Zic, Wright, Robinson, Osthimer & Tatum, Washington, DC, Alina Alonso Rodriguez, Wendy Frank Lumish, Bowman and Brooke LLP, Coral Gables, FL, Bruce T. Bishop, Eric Cook, Willcox & Savage, P.C., Norfolk, VA, M. Derek Harris, Ryan Stephen Cobbs, Carlton Fields, P.A., West Palm Beach, FL, Matthew John Conigliaro, Carlton Fields Jorden Burt, Tampa, FL, for Defendants.

### ORDER

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant Ford Motor Company's ("Defendant") Motion to Exclude the Testimony of Plaintiffs' Causation Experts and Historian, ECF No. [256] ("*Daubert* Motion"), and Motion for Summary Judgment, ECF No. [252] (the "Summary Judgment Motion," or "Motion"), as well as Plaintiffs' Motion to Preclude Various Elements of Ford's Proposed Expert Witness Testimony, ECF No. [255] ("Plaintiffs' Motion"), and Motion to Alter or Amend Judgment, ECF No. [271] ("Motion for Reconsideration"), seeking to re-

verse this Court's Order granting Defendant Union Carbide Corporation's ("Union Carbide" or "UCC") Motion for Reconsideration and dismissing Union Carbide with prejudice, ECF No. [246] ("May 4th Order"); *see Waite v. AII Acquisition Corp.*, No. 15–CV–62359, 2016 WL 2346743 (S.D.Fla. May 4, 2016). The Court has reviewed the Motions, and the exhibits attached thereto, all supporting and opposing submissions, the record, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motions are denied.

## I. Background

On October 2, 2015, Plaintiffs James John Waite, Jr., and Sandra Waite (the "Plaintiffs") brought this action against Defendant asbestos manufacturers, including Ford and Union Carbide, for injuries sustained from exposure to "asbestos dust" from products that were "mined, processed, supplied, manufactured, and distributed" by them. *See* ECF No. [1-2] at 13-34 ("Complaint") ¶¶ 9, 10. Thereafter, Union Carbide filed a Motion to Dismiss for lack of personal jurisdiction, which the Court denied on December 28, 2015. *See* ECF No. [50]. Union Carbide filed a timely Motion for Reconsideration as to the Court's general jurisdiction findings. *See* ECF No. [63]. On March 9, 2016, the Court granted the Motion for Reconsideration, finding, pursuant to *Daimler AG v. Bauman*, —— U.S. ——, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), that it lacked general jurisdiction over Union Carbide. *See* ECF No. [82]. Then, upon Union Carbide's subsequent motion, the Court found that it lacked specific jurisdiction over Union Carbide pursuant to *Walden v. Fiore*, —— U.S. ——, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014), *Fraser v. Smith*, 594 F.3d 842 (11th Cir.2010), and its progeny. *See* May 4th

Order. Accordingly, Union Carbide was dismissed from this action. In their Motion for Reconsideration, Plaintiffs now ask the Court to reconsider that Order.

At the same time, Ford seeks summary judgment as a matter of law on all claims asserted against it, as the only Defendant remaining—all others have settled or otherwise been dismissed from this action. The parties agree on very little by way of material facts relevant to resolution of the Summary Judgment Motion. *See generally* Defendant's Statement of Material Facts, ECF No. [253] ("D. SOF"); Plaintiffs' Statement of Facts, ECF No. [269] ("P. SOF"); Defendant's Response to Plaintiffs' Additional Statement of Facts, ECF No. [277] ("D. SOF R."). What is clear is that, although he was never employed as a brake mechanic, D. SOF ¶ 1, Mr. Waite performed brake and clutch repair work on certain vehicles throughout his lifetime. *See* P. SOF ¶ 19; D. SOF ¶ 3; ECF No. [252-1] (Deposition of James Waite, Volume 2, dated November 12, 2015 ("Waite Depo."), at 200). Specifically, ages sixteen to forty, Mr. Waite lived in Massachusetts, where he performed an average of four brake replacements each year. P. SOF ¶ 20; Waite Depo. at 206-207. Mr. Waite then moved to Florida where, from approximately 1981 or 1982 through 2009, he performed approximately two brake jobs per year. P. SOF ¶ 21; Waite Depo. at 207-209; D. SOF R. ¶ 21. When performing these repairs, Mr. Waite used compressed air to blow out brake drums and clutch housings. P. SOF ¶ 22; Waite Depo. at 241, 246-249; D. SOF R. ¶ 22. As to Ford vehicles in particular, Mr. Waite has identified a total of eight brake or clutch jobs where he removed original Ford equipment. D. SOF R. ¶ 24. He also performed brake or clutch repairs on Ford vehicles involving the removal and replacement of other non-

Ford brake or clutch parts. P. SOF ¶ 24. Mr. Waite concedes, however, that he has no evidence of ever being exposed to Ford replacement brakes. Waite Depo. at 219-20. In total, Mr. Waite has identified 39 vehicles that he owned during the relevant time period, 20—just over half—of which were Ford vehicles. *See* ECF No. [268-5] at 27 ("Waite Depo. Exh.").

## II. Legal Standard

### A. Expert Testimony

 Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir.2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

 An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D.Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F.Supp.2d 1126, 1129 (M.D.Fla.2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir.2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D.Fla.2012) (citing *Kilpatrick v. Breg, Inc.*, Case No. 08–10052–CIV, 2009 WL 2058384 (S.D.Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir.1976)).[1]

 When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony

---

1. Decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding decisions in the Eleventh Circuit pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62 (internal formatting, quotation, and citation omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Thus, the aforementioned factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167)).

■■■■■ The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 Fed.Appx. 816, 823 (11th Cir.2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d

1092, 1111 (11th Cir.2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir.2004) (citing *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

■■■■■ Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotation marks and citations omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir.2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotation marks and citations omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F.Supp.2d

1321, 1325 (S.D.Fla.2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

Also pertinent to expert testimony, Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires parties to provide to the other parties "the name ... of each individual likely to have discoverable information ... that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(e), regarding supplementing disclosures and responses, states in pertinent part that: "A party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e).

### B. Summary Judgment

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir.2006). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Furthermore, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir.2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir.1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir.2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 Fed.Appx. 819, 825 (11th Cir.2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Instead, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, the nonmoving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-mov-

ing party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268–69, 1272 (11th Cir.2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n. 6 (11th Cir.2004).

### C. Reconsideration

■ "While Rule 59(e) does not set forth any specific criteria, the courts have delineated three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Williams v. Cruise Ships Catering & Serv. Int'l, N.V.*, 320 F.Supp.2d 1347, 1357–58 (S.D.Fla.2004) (citing *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D.Fla.1994)); *see Burger King Corp. v. Ashland Equities, Inc.*, 181 F.Supp.2d 1366, 1369 (S.D.Fla.2002). "[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Wendy's Int'l, Inc. v. Nu–Cape Const., Inc.*, 169 F.R.D. 680, 685 (M.D.Fla.1996); *see also Campero USA Corp. v. ADS Foodservice, LLC*, 916 F.Supp.2d 1284, 1290 (S.D.Fla.2012). "Motions for reconsideration are appropriate where, for example, the Court has patently misunderstood a party." *Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc.*, 401 F.Supp.2d 1270, 1283 (S.D.Fla.2003); *see Eveillard v. Nationstar Mortgage LLC*, 2015 WL 1191170, at *6 (S.D.Fla. Mar. 16, 2015). "[T]he movant must do more than simply restate his or her previous arguments, and any arguments the movant failed to raise in the earlier motion will be deemed waived." *Compania*, 401 F.Supp.2d at 1283. Simply put, a party "cannot use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir.2005).

### III. Discussion

Against this landscape, Ford submits that Plaintiffs cannot establish that exposure to dust from Ford products caused Mr. Waite's mesothelioma—which, Defendant contends, warrants summary judgment, whether or not the Court grants its *Daubert* Motion to exclude testimony of Plaintiffs' experts. Plaintiffs counter that the evidence in the record as to causation is overwhelming. At the same time, Plaintiffs attempt to exclude portions of Ford's proposed expert witness testimony, maintaining that the evidence on which it relies is fatally flawed. The Court first addresses each party's *Daubert* Motion and then turns to whether summary judgment is appropriate.

### A. Plaintiffs' *Daubert* Motion

■ Plaintiffs spend a considerable portion of their Motion recounting the supposed history and development of Ford's litigation "science defense." P. Motion at 2 ("In the early 2000s, after a string of losses in trials regarding asbestos-related diseases and exposure to asbestos from automotive products, Ford, General Motors and Chrysler hired Denis Paustenbach and the now notorious product-defense firm Exponent to manufacture a 'science defense' to lawsuits like this case. . . ."). Al-

though perhaps narratively interesting, this background is irrelevant to the instant *Daubert* inquiry, which focuses solely on reliability and helpfulness of any given theory and/or the qualifications of the expert positing such theory. Furthermore, it is not clear what relief Plaintiffs request or, in other words, exactly which parts of Ford's expert testimony Plaintiffs seek to exclude.

Plaintiffs' Motion, nevertheless, makes a number of arguments against the strength of Ford's expert testimony—raising precisely the sorts of issues that are only appropriately decided by a fact finder. For example, Plaintiffs suggest, *inter alia*, that Ford's experts' reliance on various epidemiological studies to show no connection between work as an automotive mechanic and the development of mesothelioma is unreliable, because Ford directly or indirectly funded the research. Courts across the country, however, have found that the source of funding for a piece of peer-reviewed scientific literature is a question of weight, not admissibility. *See Mullins v. Premier Nutrition Corp.*, 178 F.Supp.3d 867, 904, 2016 WL 1534784, at *25 (N.D.Cal. April 15, 2016) ("That these studies appearing in peer-reviewed journals are industry-funded or involve animal subjects are factors that determine the weight of the opinions, not their admissibility."); *Garlick v. Cnty. of Kern*, No. 1:13–cv–01051–LJO–JLT, 2016 WL 1461841, at *3–4 (E.D.Cal. Apr. 14, 2016) (denying motion to exclude expert in part because his studies were funded in connection with litigation on the grounds that such evidence goes to "factual disagreement, bias, and weight, but not [the expert's] actual qualifications or an absence of the basis for opinions"); *In re Yasmin & Yaz Mktg., Sales Practices & Prods. Litig.*, 2011 WL 6302573, at *11–12 (S.D.Ill. Dec.

16, 2011) (denying defendants' motion to exclude plaintiffs' expert because "the industry funded the studies" on which he relied, explaining that "defendants will be able to cross examine [plaintiffs' expert] on the funding source regarding its validity, how he applied it to the studies and how it influenced his ultimate opinion in the case"); *Pirolozzi v. Stanbro*, 2009 WL 1441070, at *5–6 (N.D.Ohio May 8, 2009) (rejecting the defendants' *Daubert* challenge and finding the issue of industry-funded studies to be one of "weight to be accorded to the experts' testimony, rather than the admissibility of the testimony").

Plaintiffs also argue that the weight of epidemiological evidence does not actually support the proposition that automotive mechanics have no increased risk of mesothelioma, attacking articles co-authored by Ford's experts, Drs. David Garabrant and Victor Roggli. P. Motion at 11-15. However, again, evidence of limitations to the studies presented does not render the studies unreliable. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 553 (3d ed. 2011) (noting that "all studies have 'flaws' in the sense of limitations that add uncertainty about the proper interpretation of results"). To the extent that the limitations of Dr. Roggli's studies impact the conclusions that can be drawn from those studies in a way that is relevant to an expert's opinion, Plaintiffs are, of course, free to cross-examine Defendants' experts on those points. *See In re Actos (Pioglitazone) Products Liab. Litig.*, 2013 WL 6796461, at *14 (W.D.La. Dec. 19, 2013) (cross-examination the cure for disagreement about results of a particular study); *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, 2014 WL 7150626, at *7 (S.D.Fla. Dec. 15, 2014)

(finding cross-examination the appropriate remedy for party's criticism of expert opinion based on limited factual foundation/review of documents).

 Further argument is made that Ford's experts should not be permitted to offer opinions related to differences in biological potency, *i.e.*, the likelihood of causing mesothelioma, between chrysotile asbestos and amphibole asbestos. *See* Motion at 15-18. Among other points, Plaintiffs argue that Ford's experts did not identify a source of amphibole exposure and, therefore, the effect of amphibole exposures is irrelevant. However, this does not effect the reliability of the opinion. "Ultimately, a defendant may offer evidence of potential alternative causes of a disease or injury without needing to prove those alternative-cause theories with certainty or probability." *Woodruff v. R.J. Reynolds Tobacco Co.*, No. 3:09–CV–12594, 2015 WL 506281, at *1 (M.D.Fla. Feb. 6, 2015) (citing *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069–70 (11th Cir.2014) ("While the plaintiff bears the burden of proving that the defendant's negligence more likely than not caused the injury, that burden does not logically compel the conclusion that the defendant is precluded from offering evidence of possible explanations other than his own negligence.... The defendant's ability to present alternate causes is of paramount importance in allowing for an adequate defense.") (alterations adopted; internal quotation marks omitted)). To the extent that this defense is lacking, cross-examination is the appropriate course. *In re Trasylol Products Liab. Litig.*, 2010 WL 8354662, at *16 (S.D.Fla. Nov. 23, 2010) (finding that party's criticisms of expert's theory of alternative causation implicates weight, not admissibility).

Plaintiffs appear to essentially ask this Court to delve into the merits of the evidence upon which Ford's "hired-gun" experts rely to determine whether it in fact stands for the propositions for which it is intended. P. Motion at 7, 9, 11. These are the classic sorts of challenges for which *Daubert* instructs that vigorous cross-examination is the proper remedy. The Court simply cannot engage in the credibility and weight determinations inherent in deciding whether, for example, Ford's experts' "claim that asbestos from brakes is magically harmless" is "unscientific." Rather, such questions are properly reserved for the jury.

As to Plaintiffs' final request regarding Dr. James Crapo, however, the Court reminds the parties of its April 28, 2016, ruling, in which all disclosures submitted after the deadlines set forth in the Scheduling Order, including the materials from Dr. Crapo that were served on April 25, 2016, at 5:13 p.m., were stricken from the record and precluded from use in this case. Accordingly, to the extent that Dr. Crapo seeks to offer analysis from this April 25, 2016, report, or any other untimely analysis, he is clearly precluded from doing so—as are all other experts scheduled to testify limited to the substance of their reports. *See* Fed. R. Civ. P. 26(e)(2) ("For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."). With this caveat, Plaintiffs' Motion to exclude portions of expert testimony is denied. The Court comes to a similar conclusion with respect to Ford's *Daubert* Motion.

## B. Ford's *Daubert* Motion

Ford first seeks to exclude Plaintiffs' historian, Dr. Barry Castleman, before challenging Plaintiffs' two causation experts. The Court cannot, however, grant the Defendant the relief it requests because all three experts plainly meet the *Daubert* standard. Ford's Motion, like Plaintiffs' Motion, ultimately muddles the distinctions between admissibility, credibility, and weight.

### 1. Dr. Castleman

Ford challenges the testimony of Dr. Castleman pursuant to all three elements of *Daubert*, to wit, qualifications, reliability, and helpfulness. Ford relies on two cases from the 1980s for the proposition that Dr. Castleman's testimony should be excluded. Specifically, the Defendant argues that "just because he has read and researched ... does not mean he has the level of expertise necessary to testify as to the contents and interpretation of the materials he has reviewed." *Daubert* Motion at 25 (citing *Rutkowski v. Occidental Chemical Corp.*, No. 83–cv–2339, 1989 WL 32030, *1 (N.D.Ill. Feb. 16, 1989); *In re Related Asbestos Cases*, 543 F.Supp. 1142, 1149 (N.D.Cal.1982)). But, Ford ignores both Dr. Castleman's *curriculum vitae*, which reveals that Dr. Castleman's level of education, training, and experience far surpasses casual research, as well as the many recent asbestos litigations that have accepted Dr. Castleman's testimony against Ford. *See* ECF No. [268-7] (Dr. Castleman's trial testimony from *Williams v. Ford*, Case No. 09-L-537, Circuit Court of Illinois, Third Judicial Circuit (Crowder, B. March 10, 2010), *Dixon v. Ford Motor Co.*, 433 Md. 137, 70 A.3d 328 (2013), and *Stockton v. Ford*, Case No. C-13-6-Div I, Circuit Court of Tennessee, Twenty-Sixth Judicial District at Jackson (Morgan, J., March 30, 2015)).

Indeed, review of Dr. Castleman's actual education, training, and experience is dispositive of Ford's Motion, particularly as "an expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D.Fla. Feb. 27, 2013) (citing *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, at *3 (M.D.Fla. Aug. 3, 2005) (explaining that once there exists "reasonable indication of qualifications," those qualifications then "become an issue for the trier of fact rather than for the court in its gate-keeping capacity")). Certainly, Dr. Castleman satisfies this relatively low burden.

Dr. Castleman received a bachelor of science in chemical engineering, a masters in environmental engineering and, subsequently, a doctorate in Health Policy from the Johns Hopkins University School of Public Health. His coursework at Hopkins included extensive training in epidemiology, toxicology, biostatistics, and exposure assessment. As explained by Dr. Castleman, "training regarding how to properly evaluate scientific papers and data is critical in the field of public health because evaluation of the threats to human health and development of policies and practices to reduce those threats requires a thorough multidisciplinary evaluation of the available data." ECF No. [268-8] ("Castleman Report") at 79. Ford's challenge to the qualifications of Dr. Castleman to describe the development of scientific knowledge regarding asbestos and the corporate response thereto overlooks the fact that Dr. Castleman's doctorate from the prestigious Hopkins was granted based on his thesis on exactly that topic, which became the skeleton for his published text, entitled, *Asbestos: Medical and Legal Aspects*.

*Id.* Dr. Castleman's text is now in its fifth edition and has been cited by numerous courts, including the Supreme Court, regarding the development of historic knowledge of asbestos. *See e.g., Amchem v. Windsor*, 521 U.S. 591, 631, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (Bryer, J., concurring in part, dissenting in part, citing Castleman, 4th edition); *Peerman v. Georgia Pacific*, 35 F.3d 284 (7th Cir.1994) (citing Castleman 3rd edition), also *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 129 B.R. 710 (E.D. & S.D.N.Y.1991) (Judge Weinstein cites Asbestos: Medical and Legal Aspects twenty-eight (28) times as an authority on state of the art), *vacated on other grounds*, 982 F.2d 721 (2d Cir.1992), *modified on other grounds*, 993 F.2d 7 (2d Cir.1993). Since receiving his doctorate, Dr. Castleman has remained active in public health, publishing numerous articles and consistently being cited as an authority in the field. *See, e.g.,* Ladou, Castleman *et. al., The Case for a Global Ban on Asbestos*, Environ. Health Persp. 118:7, 897-901; Landrigan *et. al., Collegium Ramazzini: Call for an International Ban on Asbestos*, Am. J. Indus. Med. 47:471-74 (2005) (citing three publications by Dr. Castleman). Like Dr. Arthur Frank, discussed below, Dr. Castleman's lifetime of work has resulted in his election as a fellow in the Collegium Ramazzini.

Dr. Castleman was personally involved in one of the earliest efforts to warn the public of the dangers of asbestos in brakes while working at the Baltimore County, Maryland Department of Public Health, efforts about which he published in the peer reviewed literature in 1975 with members of the Mt. Sinai School of Medicine. Castleman, *The Hazards of Asbestos for Brake Mechanics*, Pub. Health Rpts, 90:3, 254-56 (1975). Ford's historic documents regarding asbestos and brakes and its

state of the art expert both cite Dr. Castleman's 1975 publication. *See* Paustenbach, *et. al., Environmental And Occupational Health Hazards Associated With The Presence Of Asbestos In Brake Linings And Pads (1900 To Present): A "State-Of-The-Art" Review*, J. Tox. & Environ. Health, Part B 7:33-110 at 74 (2004). Dr. Castleman's text contains an entire chapter examining and explaining decades of scientific articles regarding exposure to asbestos from vehicle maintenance and the health consequences thereof; and his book was cited by the U.S. EPA in its seminal 1986 warning regarding the dangers of asbestos to brake mechanics. Castleman, *Asbestos: Medical and Legal Aspects*, Chapter 8 (Wolters Kluwer Law & Business, 5th ed. 2005); U.S. EPA, *Guidance for Preventing Asbestos Disease Among Mechanics* (citing Castleman, 1st edition).

This brief history not only makes clear that Dr. Castleman is qualified, but also that his testimony is reliable, as it has been subjected to peer review and is generally accepted in the scientific community. *See Frazier*, 387 F.3d at 1261–62. Dr. Castleman's testimony, furthermore, will be helpful to a jury. A jury could not possibly examine every single letter, note, article, and publication reviewed and analyzed by Dr. Castleman in his more than four decades of practice and research. Certainly, research such as that presented can serve the purpose of providing context and grounding scientific information integral to the determination of this case. Ford argues that Dr. Castleman's opinions are irrelevant and, therefore, unhelpful and confusing to the jury, because exposure to brake dust is "harmless," *Daubert* Motion at 22—essentially, improperly asking the Court to draw "ultimate conclusions as to the persuasiveness of the proffered evidence," and, thus, invade the province of

the jury, *Quiet Tech.*, 326 F.3d at 1341; *see* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."). Ford's questions go to the weight and credibility of Dr. Castleman's testimony rather than to its reliability or helpfulness. Accordingly, the Defendant's arguments, while unpersuasive in this context, may make appropriate fodder for cross-examination before the jury.

### 2. Drs. Brody and Frank

▮ Ford seeks to exclude the opinions of Drs. Arnold Brody and Arthur Frank as unreliable and unhelpful.[2] To start, much of Ford's argument improperly contests general theories of causation held by Drs. Brody and Frank and, thus, misses the mark.[3] Despite Ford's protestations to the contrary, binding Eleventh Circuit precedent teaches that general causation is satisfied in a case involving facts like those presented here, namely, cases involving "toxins like asbestos, which causes asbestosis and mesothelioma."[4] *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir.2005). "The court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *Id.* Instead, "[t]he battleground in . . . cases . . . in which the medical community generally recognizes the toxicity of the drug or chemical at issue . . . focuses on plaintiff-specific questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury? A *Daubert* analysis in the first type of case deals with questions of individual causation to plaintiff." *Id.*; *see Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1303 (11th Cir.2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 2312, 191 L.Ed.2d 1000 (2015) ("In cases where the cause and effect or resulting diagnosis has been proved and accepted by the medical community, federal judges need not undertake an extensive *Daubert* analysis on the general toxicity question.") (citation and internal quotation marks omitted). Indeed, more than thirty years before *McClain*, in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), the Fifth Circuit recognized that mesothelioma "is a form of lung cancer caused by exposure to asbestos." *Id.* at 1083 ("[T]he effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A [plaintiff's] present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease."). These cases make no distinction between amphibole or chrysotile asbestos, as Ford implores this Court to do. Indeed, the proposition that mesotheli-

---

**2.** Ford has not challenged the extensive qualifications of either Dr. Frank or Dr. Brody— each with over 40 years of study on the connection between asbestos and disease, Dr. Frank as board-certified occupational medicine physician and Dr. Brody as a doctor of philosophy.

**3.** For example, Ford argues that Drs. Frank and Brody should have offered facts or data to show that low-level exposure from chryso-

tile-containing, automotive parts can cause mesothelioma.

**4.** Plaintiffs, nevertheless, note that Drs. Frank and Brody have both submitted considerable support for the general causation question of whether chrysotile asbestos, like that in brakes and brake wear debris, causes mesothelioma.

oma is caused by exposure to asbestos is so well-settled that the Maryland Court of Appeals in *Dixon* noted that the topic was appropriate for the taking of judicial notice. 70 A.3d at 335. With the issue of general causation resolved, therefore, the question simply becomes whether the asbestos exposures that Mr. Waite had when performing brake and clutch repair on Ford vehicles is of the magnitude of exposures that have been recognized to cause mesothelioma. The Court now examines the testimony of Drs. Brody and Frank to determine whether it is both reliable and helpful to a trier of fact in resolving this narrowed issue.

 As to specific causation, Ford challenges the methodology employed by Drs. Brody and Frank, arguing that "[w]ithout consideration and evidence of dose, the experts' testimony is inadmissible to establish that exposure to dust from Ford's products was a substantial factor in causing Mr. Waite's mesothelioma (i.e., specific causation)." Motion at 3. However, both Dr. Frank and Dr. Brody follow the same weight-of-the-evidence methodology used by the International Agency for Research on Cancer ("IARC"), the World Health Organization ("WHO"), and the United States Agency for Toxic Substances and Disease Registry ("ATSDR"). *See* ECF Nos. [268] (Plaintiffs' Response to Defendant's *Daubert* Motion, or "*Daubert* Response"), [268-4] (Brody Report at ¶ 43; Brody testimony from *Stockton*, Case No. C-13-6-Div I). This weight-of-the-evidence approach to causation requires consideration of all available scientific evidence, including epidemiology, toxicology (animal studies), cellular studies (in vitro), and molecular biology and has been validated by the courts. *See* ECF No. [268-1] ("Frank Report") at 23-24. Ford does not

challenge the validity of weight-of-the-evidence analysis when evaluating the scientific evidence, but claims that the alleged lack of statistically significant epidemiological studies demonstrating an increased risk of mesothelioma to "mechanics" trumps all other evidence. *Daubert* Motion at 22-23.

The Court, nevertheless, remains unconvinced that this one type of scientific evidence properly overcomes all others. *See* ECF No. [268-7] ("Frank Affidavit" ¶¶ 23-33). In fact, in Florida, "it is well settled that a lack of epidemiological studies does not defeat submission of expert testimony and opinions." *U.S. Sugar Corp. v. Henson*, 823 So.2d 104, 110 (Fla.2002) (citing *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir.1998) ("The fact that a cause-effect relationship ... has not been conclusively established does not render Dr. Spindler's testimony inadmissible."); *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 980 n. 2 (4th Cir.1987) (holding that epidemiological studies are not required prior to expert opinion admissibility)). Plaintiffs' experts have properly considered and evaluated a variety of scientific evidence concerning asbestos in formulating their opinions—including epidemiological studies, animal, cellular and molecular studies, and unbiased reviews of these materials by research agencies, such as ATSDR and IARC. *See Daubert* Response at 12-13; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that *Daubert* inquiry is designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). The parties simply have competing beliefs as to the best

practice for understanding the different factors at play in this case as to causation and the development of cumulative diseases. However, none of the concerns presented bear on reliability. Furthermore, the cases to which Ford cites do not support the proposition that Drs. Brody and Frank's reliance on the weight-of-the evidence methodology renders their reports inadmissible. *See Moeller v. Garlock*, 660 F.3d 950, 955 (6th Cir.2011) (involving the sufficiency of the evidence supporting a verdict, rather than a *Daubert* inquiry, based on a pipefitter's exposure to asbestos insulation); *Bostic v. Georgia–Pacific*, 439 S.W.3d 332, 338 (Tex.2014) (applying Texas law, which uniquely among the 50 states requires a quantification of dose and product-specific epidemiology showing a doubling of the risk); *Borg–Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex. 2007) (establishing such Texas requirement).

The opinions are not only reliable but helpful. For example, Dr. Frank walks through application of the weight-of-the evidence methodology, which would assist a trier of fact in quantifying his theory of causation. In so doing, Dr. Frank references Ford documents, which represent that the act of blowing out brake drums on trucks can result in peak exposure levels of 7,090,000 fibers per cubic meter and 8-hour time weighted average exposures of 1,750,000 fibers per cubic meter. *See* ECF No. [268-5] (Hickish *et al.*, *Exposure to Asbestos During Brake Maintenance*, Ann. Occup. Hyg. 13:17-21 (1970) at p. 19, Table 4). In contrast, Dr. Frank notes that "ambient" asbestos levels during the relevant time period averaged around 10 fibers per cubic meter in rural areas and in urban area up to 100 fibers per cubic meter. *See* Frank Report, 2013 Affidavit ¶ 163. In other words, one 8-hour day of work at the levels shown in Ford's study of blowing out truck brakes would result in an exposure equivalent to 700 years of "ambient" exposure at work as a farmer or 70 years of "ambient" exposure at work as a lawyer in an urban environment. *See Daubert* Response at 15. Dr. Frank discussed this comparison of ambient to occupational and para-occupational exposure levels in his Report. *See* Frank Report, 2013 Affidavit ¶¶ 163-64. As noted by Dr. Frank therein, at the average exposure level of 1.5 fibers per cubic centimeter for blowing out passenger car brakes with compressed air, Mr. Waite would be exposed to between 15,000 and 150,000 times the ambient level of asbestos in the environment. *See id.* As previously stipulated by the parties, Mr. Waite performed approximately 4 brake replacements a year for the decades that he lived in Massachusetts and approximately 2 brake replacements a year after moving to Florida, totaling approximately 160 brake replacements. Mr. Waite identified 39 vehicles that he owned during this time, 20 of which were Fords. *See* Waite Depo. Exh. Although Mr. Waite was unable to state precisely the number of times he changed brakes on his Fords and admitted that he did not perform brake repair on every vehicle he ever owned, Dr. Frank posits that the jury can reasonably conclude that approximately half—i.e., 20 divided by 39—of the brake and clutch repairs at issue were performed on Ford vehicles. *See Daubert* Response at 16. The Court agrees.

Dr. Frank expressly does not offer any legal opinion regarding whether Mr. Waite's exposures to any of these products were "substantial." Rather, Dr. Frank offers his opinions regarding the medical significance of Mr. Waite's exposures in causation of his disease—and only does so after consideration of the particular facts

of Mr. Waite's case. After summarizing in detail Mr. Waite's work with drywall joint compound, brakes, and clutches—including the frequency, proximity, and regularity of that work and the work practices used by Mr. Waite—Dr. Frank expressed the following reasoned opinion:

> Based upon my review of the materials sent to me, it is my opinion, held with a reasonable degree of medical certainty, that Mr. Waite developed a malignant pleural mesothelioma that become metastatic as a result of his exposures to asbestos described above and in his deposition. The cumulative exposures he had to asbestos, from any of these products, specifically the drywall joint compound, brakes and clutches, combined to cause and contribute to his developing this malignancy. Each of the exposures would have been expected to be at levels many orders of magnitude above background or ambient levels of exposure and all of his exposures would have been medically significant causes of his mesothelioma.

Frank Report, 2013 Affidavit ¶ 175.

In contrast, Dr. Brody has not opined on or applied facts specific to Mr. Waite's circumstances. Instead, his testimony in this case concerns the carcinogenesis, including the impact of cumulative exposures on molecular and cellular processes that result in disease, as described by Dr. Brody and as recognized since *Borel*, 493 F.2d 1076. *See Daubert* Response at 20. Indeed, because Dr. Brody has not expressed an opinion regarding specific causation of Mr. Waite's cancer, but simply provides reliable background on asbestos diseases like mesothelioma—going to general causation—his testimony is permissible. *See, e.g., In re Asbestos Product Liability Litigation*, 2010 WL 4676563, at *3–

4 (E.D.Pa. Nov. 15, 2010) ("Dr. Brody may not have relied on epidemiological studies, but his expert opinion is not without a reliable basis.... Given the purpose of Dr. Brody's testimony, to assist the jury in understanding the relationship between exposure to asbestos fibers and disease processes generally, and the breadth of peer-reviewed publications relied on, this Court will not disturb [the court's] finding that Plaintiff has met the reliability requirement of Rule 702 and *Daubert*.").

The Court's role in this context is only to ensure that speculative, unreliable testimony does not reach the jury. Its role is not to draw "ultimate conclusions as to the persuasiveness of the proffered evidence," and, thus, to "supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Because the opinions of Drs. Brody and Frank are thoroughly reasoned and based on sound methodology, their reports will not be stricken and they will be permitted to testify at trial. To the extent that Ford believes that the weight-of-the evidence methodology is problematic, or the two experts fail to demonstrate causation otherwise, these are lines of attack more appropriately addressed through cross-examination. *See Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Ultimately, Ford has not presented sufficient grounds for exclusion of expert testimony pursuant to *Daubert* or Fed. R. Evid. 702. The Court, therefore, considers the totality of this expert testimony—from both Plaintiffs' experts and Defendant's experts, to the ex-

tent relevant—in its evaluation of Ford's Summary Judgment Motion.

### B. Summary Judgment Motion

Ford maintains that, even with testimony from Drs. Brody and Frank, Florida precedent precludes relief under the instant facts—where, as Ford claims, Plaintiff is seeking to hold Ford liable for exposures to friction-product dust from other manufacturer/seller's friction replacement parts. Plaintiffs counter that they have adduced sufficient evidence for a jury to conclude that Mr. Waite was exposed to asbestos attributable to his use of Ford's products, and that such exposures substantially contributed towards the development of his mesothelioma. *See* ECF No. [270] (Plaintiffs' Response to Ford's Motion, or "Response") at 2. In this regard, Plaintiffs' claim against Ford sounds in both strict liability and negligence. While distinct causes of action, Ford's argument to this Court, which turns on causation, is the same—namely, that the Plaintiffs have failed to demonstrate that exposure to asbestos from Ford products was a substantial factor in bringing about Mr. Waite's mesothelioma.

### 1. Dr. Frank's methodology is consistent with Florida law

As noted above, "where the cause and effect or resulting diagnosis has been proved and accepted by the medical community," a plaintiff need only demonstrate specific causation, rather than both general and specific causation. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1303 (11th Cir.2014) ("Specific causation refers to the issue of whether the plaintiff has demonstrated that the substance actually caused injury in her particular case."). Specifically, Ford contends

that Dr. Frank's weight-of-the-evidence approach is incompatible with Florida law, which instructs that "a plaintiff: 'must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.'" *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir.2010) (quoting *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla.1984)) (finding that, to prove causation, a plaintiff must present evidence that rises above speculation). In support of its argument, Ford cites to two cases that are inapposite – the same cases that failed to carry the day in Ford's *Daubert* Motion. *See Moeller*, 660 F.3d at 955; *Bostic*, 439 S.W.3d at 360–61.

In *Moeller*, the Sixth Circuit reversed a district court's denial of a defendant's motion for judgment as a matter of law, finding that the district court trial record "simply d[id] not support an inference that [defendant's product] was a *substantial* cause of his mesothelioma." 660 F.3d at 955 (emphasis in original). However, this determination is easily distinguishable—and, thus, unhelpful here—for two reasons. First, *Moeller* was decided after a full trial, where the district court was not required to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Davis*, 451 F.3d at 763. Second, the determination hinged on a full presentation of facts that were found lacking, *e.g.*, "the Plaintiff here presented no evidence quantifying Robert's exposure to asbestos from Garlock gaskets[, as he] ... failed to establish how many Garlock gaskets he removed, or how frequently he removed—as opposed to installed—them." *Moeller*, 660 F.3d at 955. Here, any such ruling would be premature. Furthermore,

as noted in the discussion of Defendant's *Daubert* Motion, Dr. Frank has presented evidence and analysis quantifying Mr. Waite's exposure to asbestos products manufactured by Ford. Accordingly, the Court cannot conclude here, viewing the facts in the light most favorable to the Plaintiffs, that the evidence does not support an inference that such exposures were a substantial factor leading to the development of his mesothelioma. Likewise, *Bostic* does not stand for the proposition that Ford suggests, namely that Dr. Frank's theory is *per se* unreliable in light of the "substantial factor" language, as it hinges on Texas law—a state that uniquely imposes a heightened requirement for a plaintiff to "prove he was exposed to a dose of the defendant's toxin that more than doubled his risk of injury." 439 S.W.3d at 360–61.

These arguments do not detract from Dr. Frank's testimony, which clearly "affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result [mesothelioma]." *Guinn*, 602 F.3d at 1256. Dr. Frank applies a reliable methodology to the facts of this case, with repeated reference to the record as well as Mr. Waite's personal history, as outlined in detail in this Court's analysis of the *Daubert* Motion. Dr. Brody's testimony further elucidates the proper context for understanding Dr. Frank's analysis of the development of Mr. Waite's disease. This evidence certainly rises above speculation and, at the very least, establishes a genuine issue of material fact as to causation.

### 2. The bare metal defense does not preclude liability

■ Ford next argues that it is protected by the bare metal defense. Specifically, the Defendant submits that it cannot

be held liable because Mr. Waite can only identify a total of eight brake jobs or clutch jobs where he removed original equipment. D. SOF R. ¶ 24. Mr. Waite also performed other brake and clutch repairs on Ford vehicles that involved the removal and replacement of non-Ford brake or clutch parts, P. SOF ¶ 24; however, Ford argues that it cannot be held liable based on exposures to products that it did not place in the stream of commerce. The Court agrees with the Defendant's recitation of the bare metals defense. Nevertheless, it is difficult to ignore the gaping hole in Ford's argument—namely, that Mr. Waite performed at least eight brake and clutch repairs with original Ford equipment. That fact alone meaningfully distinguishes this case from those cited by Ford that have applied the bare metal defense. Furthermore, it simply precludes application of the defense as a wholesale bar to liability because, under these facts, Ford is not only a "bare metal" supplier but also a manufacturer. And, any argument that the asbestos exposures from the eight brake or clutch repairs involving Ford equipment were not a substantial factor in bringing about Mr. Waite's disease presents a fact-intensive question that is better reserved for a jury. *See Dowdy v. Suzuki Motor Corp.*, 567 Fed.Appx. 890, 892 (11th Cir. 2014) ("[C]ausation-in-fact is ordinarily a factual question reserved for the jury.").

■ "In short, a manufacturer's duty to warn, whether premised in negligence or strict liability theory, generally does not extend to hazards arising exclusively from *other* manufacturer's products, regardless of the foreseeability of the combined use and attendant risk." *Faddish v. Buffalo Pumps*, 881 F.Supp.2d 1361, 1371 (S.D.Fla.2012). Accordingly, a defendant "bare metal" supplier cannot be liable for a

third party's asbestos-containing product. *See id.*; *Oneal v. Alfa Laval*, No. 13–61510–CIV, 2014 WL 5341878, at *5–6 (S.D.Fla. Oct. 19, 2014) ("This Court likewise is persuaded that the maker of a product that contains no asbestos may not be held liable for injuries caused by asbestos that others supply or use in connection with the product."); *Thurmon, v. Georgia Pac., LLC*, No. 14–15703, 650 Fed.Appx. 752, 756, 2016 WL 3033147, at *3 (11th Cir. May 27, 2016) ("According to the asbestos MDL court, the 'bare metal defense' stands for the proposition that a valve manufacturer is 'not liable for injuries caused by asbestos products, such as insulation, gaskets, and packing, that were incorporated into their products or used as replacement parts, but which they did not manufacture or distribute.' As such, the 'bare metal defense' is, essentially, a causation argument.' ") (quoting *Conner v. Alfa Laval, Inc.*, 842 F.Supp.2d 791, 793 (E.D.Pa.2012)). "Regardless of the foreseeability risk, here the duty to act is limited to entities within a product's chain of distribution on theory that these are the entities best motivated and capable of controlling the risk." *Faddish*, 881 F.Supp.2d at 1372 (citations omitted).

■ Then, as the Eleventh Circuit has noted, "a failure-to-warn claim, whether grounded on a strict liability or negligence theory, requires proof that the defendant's allegedly defective product proximately caused the plaintiff's injuries." *Thurmon*, 650 Fed.Appx. at 761, 2016 WL 3033147, at *7. Accordingly, in *Thurmon*, the Circuit Court found that the plaintiffs could not prevail because their "claims lack[ed] the crucial element of causation. In other words, [the Circuit Court's] conclusion that the plaintiffs failed to demonstrate that a product manufactured by Crane Co. proxi-

mately caused Thurmon's injuries [wa]s a case dispositive determination that necessarily extinguishe[d] a necessary element of any failure-to-warn claim." *Id.*

However, the inverse is also true—the bare metals defense obviously does not apply when third-party liability is not at issue. Here, in stark contrast to *Thurmon*, plaintiffs have presented evidence that supports the causation theory that asbestos exposures from brakes and or clutches *manufactured by Ford* were a substantial factor resulting in Mr. Waite's mesothelioma. *See* Resp. at 4 ("Plaintiffs maintain that even if the jury were to consider only the four brake replacements and four clutch replacements wherein Mr. Waite removed original equipment brakes and clutches on Ford vehicles, Plaintiffs' experts' testimony would support a finding that such exposures were a substantial contributing factor in causing Mr. Waite's mesothelioma.").

To the extent that these exposures to asbestos-containing Ford products alone did not substantially contribute to development of the disease, the bare metal defense may factor in as a bar to recovery for injury sustained from non-Ford asbestos-containing parts. Plaintiffs, nevertheless, make a number of other arguments against the bare metal defense, as it would be applied to exposures from non-Ford parts, proceeding on theories of negligent design. First, they aver that evidence in the record confirms that the asbestos-containing brake wear debris to which Mr. Waite was exposed resulted from the interaction of the metal components of Ford's vehicles with the friction linings as designed by Ford—rather than from the non-Ford parts themselves. Furthermore, Plaintiffs' Response contends that the *Faddish* and *Oneal* courts were not con-

fronted with the evidence that is present in this case wherein the defendant manufacturer's products required the use of asbestos components, *i.e.*, the asbestos-containing brakes and clutches were integral to the function, design, and operation of Ford's vehicles. In *Oneal*, the plaintiffs only argued that it was foreseeable that the products at issue "might" use asbestos-containing replacement components. 2014 WL 5341878, at *5. Significantly, the distinction between Plaintiffs' argument here and the facts presented in *Faddish* and *Oneal* has been noted by other courts, which have recognized an exception to the bare metal defense. *See, e.g., May v. Air & Liquid Systems Corp.*, 446 Md. 1, 129 A.3d 984 (Md.2015). Specifically, these courts have found that " 'a duty may attach where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos containing material would necessarily be replaced by other asbestos-containing material, whether supplied by the original manufacturer or someone else.' " *Id.* at 446 Md. at 14–15, 129 A.3d 984 (quoting *Quirin v. Lorillard Tobacco Co.*, 17 F.Supp.3d 760, 769–70 (N.D.Ill.2014)) (emphasis removed) (recognizing a duty of a manufacturer to warn "when its product not only has asbestos components, but also cannot function properly without these hazardous components, and ... [the consumer] ... will be exposed to the asbestos during necessary, periodic replacement of the parts with other asbestos-containing parts"); *see also Osterhout v. Crane Co.*, Case No. 5:14-cv-00208-MADDEP, ECF No. [361] at 23 (N.D. N.Y. Mar. 21, 2016) (holding that bare metal defense does not provide a product manufacturer blanket immunity for liability for exposures to asbestos-containing replacement parts, and finding that a duty to warn indeed exists "where the use of asbestos-containing materials was specified by a defendant, was essential to the proper functioning of the defendant's product, or was for some other reason so inevitable that, by supplying the product, the defendant was responsible for introducing asbestos into the environment at issue"). Notably, the *Osterhout* court carefully distinguished such cases from the California Supreme Court's decision in *O'Neill v. Crane Co.*, 53 Cal.4th 335, 135 Cal.Rptr.3d 288, 266 P.3d 987 (2012), relied upon by *Faddish*, 881 F.Supp.2d at 1372–1373, as leaving room for an exception to the rule: "It qualified its conclusion that the defendant, Crane Co., could not be held liable for products manufactured by third parties by noting that 'the evidence did not establish that the defendants' products needed asbestos-containing components of insulation to function properly. It was the Navy that decided to apply asbestos-containing thermal insulation to defendants' products and to replace worn gaskets and packing with asbestos-containing components.' " With that said, the Court need not determine at this juncture whether *Faddish* left room for such an exception to the bare metal defense, and it makes no such conclusion here.

For resolution of the instant Motion, it is enough that Plaintiffs have presented evidence showing that Mr. Waite was exposed to asbestos-containing Ford products—and that these exposures alone were a substantial factor in bringing about his mesothelioma. Clearly, Ford believes that any such exposures to its own asbestos-containing products were far too minimal to contribute substantially to the development of Mr. Waite's disease. Nevertheless, such a thesis calls for fact determinations of the sort

that are inappropriate for the Court to render. Plaintiffs have shown that a genuine issue of material fact remains as to whether or not the asbestos exposures recounted herein, and for which Ford is accountable by a supported theory of liability, were a substantial factor leading to Mr. Waite's illness. The Court cannot say, as a matter of law, that Ford is not liable for the development of Mr. Waite's disease where it has been presented with undisputed facts that Mr. Waite owned 20 Ford vehicles on which he performed regular brake and clutch repairs, at least eight of which repairs involved original Ford asbestos-containing parts.

### C. Motion for Reconsideration

■ As the Court recognized in its May 4th Order, the Supreme Court's opinion in *Walden v. Fiore* controls in the evolving realm of specific jurisdiction. The Court previously had cause to reconsider its specific jurisdiction findings pursuant to *Walden, Fraser*, and other persuasive authority; having now thoroughly analyzed those decisions, and absent any new authority to the contrary, the Court does not find re-litigation proper or warranted. *See Michael Linet, Inc.*, 408 F.3d at 763.[5] As they do now, Plaintiffs argued in their Response dated April 5, 2016, that the instant case is distinguishable from *Walden*, and that the Court has jurisdiction over Union Carbide under *Walden'* s "suit-related conduct" standard. *See* ECF No. [125] at 5-6. Plaintiffs also argued, as they

do now, that in any regard, Union Carbide's contacts in Florida and failure to warn end users of the dangers of its products constituted a "but-for" cause of Mr. Waite's injuries. *See id.* at 5. The Court considered all of the case law Plaintiffs now attempt to distinguish and rely upon, including *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and the Court took pains to discuss the applicability of each case to the instant facts. Plaintiffs provide the same facts now that they have relied on from the onset of this dispute to show Union Carbide's ties to Florida—the same facts that the Court has fully considered and applied to relevant case law, determining them insufficient to confer specific jurisdiction in this case. *See* ECF No. [246] at 8-9. Having now reviewed Plaintiffs' argument for the third time, the Court does not find any reason to reconsider or amend its May 4th Order. *See* Fed. R. Civ. P. 59(e); *see also Compania*, 401 F.Supp.2d at 1283; *Michael Linet, Inc.*, 408 F.3d at 763.

Specifically, Plaintiffs argue that reconsideration and amendment is necessary because the Court "manifestly misapplied controlling law." Plaintiffs appear to agree with the Court's holding that "*Fraser*, read in light of *Walden*, requires that a defendant's suit-related conduct constitute the but-for cause of a plaintiff's injury," but disagree with the Court's conclusion that "Mr. Waite's cause of action (his malignant mesothelioma) did not arise from Defendant's actions within the forum." May 4th

---

5. Plaintiffs do not cite to any authority in their Motion or Reply that the Court did not previously consider. *See* ECF Nos. [93], [125], [182] (motions practice). This includes *Aubin v. Union Carbide Corp.*, 177 So.3d 489 (Fla. 2015), *McConnell v. UCC*, 937 So.2d 148 (Fla. 4th Dist. Ct.App.2006), *UCC v. Kavanaugh*, 879 So. 2d 42 (Fla. 4th Dist.Ct.App.2004), and *Lagueux v. Union Carbide Corp.*, 861 So.2d 87 (Fla. 4th Dist. Ct.App.2004)—state court actions involving exposure to Union Carbide's product in Florida—which the Court previously considered in its May 4th Order and found did not establish that Union Carbide's "suit-related" activities in Florida constitute the "but-for cause" of Mr. Waite's injuries as required by *Walden* and *Fraser*. *See* May 4th Order at 11; *see also* ECF No. [82] at 19-20.

Order at 9, 10 (internal quotations omitted). Plaintiffs also "agree with UCC and the Court that [Plaintiffs'] decision to move to Florida does not tie UCC's conduct to the Florida cause of action in 'any meaningful way.'" ECF No. [284] (Plaintiffs' Reply) at 5, 6 (quoting the May 4th Order at 11 (quoting *Walden*, 134 S.Ct. at 1125)). Plaintiffs, however, contend that the Court failed to adequately consider their argument that Union Carbide's "failure to warn" end users nationwide and in Florida "creates a substantial connection between UCC and Florida." *See id.* at 4-5. The Court, however, fully considered Plaintiffs' argument at pages ten to eleven of its May 4th Order, as follows:

> Plaintiffs argue ... that they have met this standard because Union Carbide's conduct in concealing the dangers of its product and failing to warn both joint compound manufacturers and end users, both in Florida and nationally, is precisely what Plaintiffs allege is the cause of Mr. Waite's injury. As an initial matter, the allegations in Plaintiffs' Complaint overwhelmingly relate to the time of Mr. Waite's exposure to Defendants' Asbestos Products in Massachusetts, not his subsequent move to Florida. But even assuming that Plaintiffs pled a failure to warn cause of action somehow tethered to Florida, the minimum contacts requirement entails a relationship that "arise[s] out of contacts that the defendant *himself* creates with the forum State," not merely "where the plaintiff experienced a particular injury

or effect." Again, Plaintiffs' unilateral decision to move to Florida proximately caused their failure to be warned in Florida. Their decision to move, however, does not tie Union Carbide's conduct to the Florida cause of action "in any meaningful way."

May 4th Order at 10-11 (citing *Walden*, 134 S. Ct. at 1122, 1125) (emphasis in original; other internal citations and quotation marks omitted). The Court does not find any clear error in this analysis warranting reconsideration or amendment. And, to the extent that Plaintiffs attempt to relitigate their arguments that Union Carbide "purposefully availed itself of forum benefits" and "reasonably anticipate[s] being haled into court," these arguments were addressed at length in the May 4th Order. *See id.* at 11. The Court has not "patently misunderstood" Plaintiffs' position but, rather, has rejected Plaintiffs' arguments.[6] *See Compania de Elaborados de Café*, 401 F.Supp.2d at 1283. This, of course, does not establish grounds for reconsideration or amendment, and the Motion is accordingly denied.

## V. Conclusion

For the foregoing reasons, Plaintiffs' *Daubert* Motion, **ECF No. [255]**, Ford's *Daubert* Motion, **ECF No. [256]**, and Ford's Summary Judgment Motion, **ECF No. [252]**, are **DENIED**. However, relevant to Plaintiffs' *Daubert* Motion, to the extent that Dr. Crapo seeks to offer analy-

---

6. The Court notes that at least one district court has relied on the reasoning that Plaintiffs now ask the Court to reconsider, observing that "after extensive analysis and absent clear precedent from [the] governing court of appeals, [the Court] held the plaintiffs' decision to move to Florida may proximately cause their failure to be warned in Florida but

'does not tie Union Carbide's conduct to the Florida cause of action in any meaningful way.'" *Sugartown Worldwide, LLC v. Shanks*, No. CV 14–5063, 2016 WL 2654069, at *7 (E.D.Pa. May 6, 2016) (quoting *Waite v. AII Acquisition Corp.*, No. 15–CV–62359, 2016 WL 2346743, at *5 (S.D.Fla. May 4, 2016) (internal quotations omitted)).

1322

sis from his report dated April 25, 2016, or any other untimely analysis, he is clearly precluded from doing so—as are all other experts scheduled to testify limited to the substance of their reports. *See* Fed. R. Civ. P. 26(e)(2); ECF No. [221]. Plaintiffs' Motion for Reconsideration, **ECF No. [271]**, is also **DENIED.** Per the Order Scheduling Pretrial Conference and Order of Instructions Before Pretrial Conference, ECF No. [285], the Court will hold a hearing on **July 21, 2016,** to discuss all pretrial matters

**DONE AND ORDERED** in Miami, Florida, this 11th day of July, 2016.